HARDY, Judge.
This is a suit in which plaintiff claims compensation for alleged total and permanent disability arising from an occupational disease, invoking the provisions of LSA-R.S. 23:1031.1, which section brings certain particularly specified occupational diseases within the purview of the compensation statute. The defendant is the com *384 pensation insurer of Remington-Rand, Inc., the operator of the Louisiana Ordnance Plant. After trial there was judgment in favor of plaintiff awarding compensation at the rate of $30 per week during the period of his disability, not to exceed 400 weeks, subject to a credit of 25 weeks, during which period plaintiff received payment of compensation from defendant. From this judgment defendant has appealed.
The basis of plaintiff’s claim is found in the contention that he suffers from an occupational disease which was caused from, in the words of the section of the statute above noted:
“Poisoning by or other disease resulting from contact with
* * * * * * “aromatic and cyclic hydrocarbons and their nitro, amino and other compounds.”
In simple language, plaintiff complains to be suffering from- the effect of TNT poisoning, which clearly brings him under the above quoted wording of the statute, for according to the uncontroverted testimony of one of the expert witnesses in the case:
“TNT is the common name for 3, 4, 6 — trinitrotoluene, an aromatic nitro compound.”
The issue here presented involves purely and solely the determination of a question of fact, and in this instance a fact which must and can only be resolved by expert medical-testimony. In the development of this testimony five medical experts were examined —Drs. R. B. DeLee of Shreveport and Tom Richardson of Minden, for plaintiff, and Drs. James H. Eddy, Jr. of Shreveport, Samuel B. Nadler of New Orleans, and S. E. Potts, Medical Director of the Louisiana Ordnance Plant, for defendant. The testimony of these witnesses will be discussed somewhat in detail later in this opinion, but at 'this point we wish to take occasion to say that we have never read any record with such detailed, meticulous and obviously expert and authoritative analyses as have been presented by the above named distinguished members of the medical profession.
As background for the determination of the question presented, we set forth the following facts in connection with plaintiff’s employment, the onset and development of the disease from which he suffers.
Plaintiff, a manual laborer, 33 years of age at the time of trial, began work at the Louisiana Ordnance Plant on September 3, 1951, and some six months later was promoted to the classification of foreman and assigned to what is known as a “melt” area, in which compounds commonly known as TNT and RDX are melted and poured into shell cases. Plaintiff worked in this area for a period of some 17 months, during which time he was subject daily to contact with TNT dust and fumes. In February, 1953 plaintiff testified he became affected with frequent attacks of nausea and vomiting, which, as best we can determine, Occurred during the late hours of. the night, at which time plaintiff was off duty. Plaintiff testified that at times these spells of vomiting were accompanied by evidences of blood. On February 23, 1953, plaintiff reported to Dr. Potts, the plant- medical director, who diagnosed his condition as toxic vomiting and transferred him from the toxic area. After some two weeks plaintiff returned to his work in the “melt” area, but he testified that his physical condition steadily deteriorated, being accompanied by increasing weakness, a continuance of vomiting spells and marked by a jaundiced appearance. Plaintiff’s employment was terminated on May 8, 1953, apparently for some failure to recognize and reject a defectively loaded shell, and after his discharge he worked for some three weeks as a sub-foreman on a railroad crew. In July of 1953, distressed by his condition and alarmed by the fact that the jaundice condition had increased to such extent that his eyes and fingernails had become yellow, plaintiff consulted Dr. Torn Richardson at Minden and was treated several times between the dates of July 20th and July 30th, which treatment consisted of the administration of penicillin, bed rest and liquid diet. On July 31, plaintiff consulted Dr. James H. Eddy, Jr. at Shreveport, who *385 immediately caused him to be hospitalized in the Physicians & Surgeons Hospital at Shreveport, where he remained under Dr. Eddy’s treatment for some 35 days. After discharge from the hospital plaintiff testified he attempted to work but was unable to satisfactorily perform manual labor because of his distressful physical condition, and, as a result, had been continuously unemployed up to the time of trial. ■
Chronologically related to the above factual narrative, which, by the way, is substantially predicated upon plaintiff’s testimony, wé find that plaintiff was first observed in February, 1953, by Dr. S. E. Potts, the plant medical director, a graduate of Vanderbilt University in 1912, who interned at the Shreveport Charity Hospital, engaged in general surgery and general practice, operating his own private hospital, until in 1951 he became employed by the Louisiana Ordnance Plant. In his capacity as medical director, Dr. Potts was charged with the responsibility for an average personnel of some 6,000 employees, and, by reason of the nature of the work performed at the plant, he was brought into first-hand contact with the toxic effects of TNT and related substances.
Dr. Potts testified that he saw plaintiff on February 23,' 1953, ai which time he'gave a history of nausea and vomiting, and .requested transfer out of the toxic area. The witness did not find any evidence of a jaundiced condition or any other serious symptoms, and did not find plaintiff disabled to perform manual labor. Although plaintiff was ordered to stay out of the TNT area for a month, it appears that he returned to such area before the end of this period. However, plaintiff reported to Dr. Potts on March 16th for a regular checkup, at which time the witness found his condition normal, particularly as to hemoglobin percentage, red blood count and urinalysis, after which he was okayed for return to the toxic area. The witness had no history of any complaints, nor did he find any evidence of jaundice. The witness last saw plaintiff on April 1,1953.
In addition to his testimony, based upon personal observation and contact with plaintiff, the witness testified, hypothetically, that disability resulting from a toxic condition caused by TNT usually manifests itself in a period of the first five days after leaving contact,, and that the' body customarily rids itself of the major portion of the TNT toxin in a period of about five days.
Plaintiff was.next examined by Dr. Tom Richardson of. Minden, a 1938 graduate from the L. S. U. School of Medicine, who has been in general practice in Minden . since said date, except for a period of six months' during which he" was engaged in special work. Dr. Richardson testified that he first had occasion to examine plaintiff on July 20, 1953, at which time diagnosis was “toxic jaundice,' probably due to TNT.” After making said tests Dr. Richardson reached the conclusion that plaintiff was suffering from a toxic jaundice “due to the action of what he thought to be a toxin on the liver.” The doctor was not of the opinion that plaintiff was suffering from any permanent disability. The witness examined plaintiff’s skin and eyeballs during the course of his testimony on trial and expressed the opinion that the jaundice from which plaintiff had suffered had cleared up as far as any visual examination could detect. The witness did not see plaintiff professionally after July. 30,, 1953, at which time plaintiff discontinued his treatment by Dr. Richardson.
Next Dr. Eddy was consulted by plaintiff on July 31, 1953. Dr. James H. Eddy", Jr., was graduated in medicine from Tulanf University in 1938, served an. interneship and residency in surgery at the Charity ' Hospital in Shreveport; became medical director of the Louisiana Ordnance Plant in 1941, and has, since 1945, been engaged in the private practice of surgéry in Shreveport. He is a member of a number of professional societies and Senior Visiting Surgeon and Chief of Surgical Service at the Confederate Memorial Hospital in Shreveport. During his service as .medical director at the Louisiana Ordnance .Plant an average of between 10,000 and 15,000 persons wpre employed, and a large part of their work involved the handling of *386 TNT. We find it unnecessary to develop the details of Dr. Eddy’s experience and qualifications but we are of the opinion that the record in this case justifies the conclusion that this witness is, in all probability, the outstanding expert in the United States on diseases arising from TNT toxins, and is possibly better qualified, by actual training and experience, in observing and treating such conditions than any other member of the medical profession in the entire country;
We quote the following pertinent extract from Dr. Eddy’s testimony:
“We saw more TNT hepatitis than anybody in this country in association with this last war. The English had some large series but in this country the plant -here in Louisiana had the questionable honor of having seen more cases than probably all other plants combined in the United States * * * >>
So much for Dr. Eddy’s qualifications. We turn now to what is obviously the crux of the case. Consideration of all the medical testimony leads to the very definite conclusion that plaintiff suffered either from cirrhosis of the liver or from a gall bladder condition caused by an obstruction of the duct of that organ. This observation is of paramount importance because, on the basis of the expert testimony, if plaintiff’s condition resulted from gall bladder trouble any' connection with an occupational disease resulting from TNT toxins is effectively eliminated and his claims consequently should be denied. If, on the other hand, plaintiff’s condition results from a cirrhosis of the liver, such a result, according to the testimony, could possibly have been effected by his handling of and contact with TNT.
It is thus to be observed that if the medical testimony preponderates in favor of a diagnosis of gall bladder trouble and'preponderates against the acceptance of the diagnosis of cirrhosis of the liver, plaintiff’s claims múst be denied.
With due regard to and respect for the testimony of Drs. Potts and Richardson, which we have above discussed, we do not think these distinguished gentlemen had the opportunity to make the thorough examinations and observation of plaintiff which were accorded to the other medical experts, namely, Drs. Eddy, DeLee and Nadler. It is for this reason we observe that we do not find that the testimony of Drs. Potts and Richardson is of substantial value, and we therefore advert to a somewhat more detailed consideration of the voluminously detailed testimony of Drs. Eddy, DeLee and Nadler.
Dr. Eddy prefaced his specific testimony with reference to plaintiff by expressing some conclusions drawn from his first-hand observation of numerous cases of TNT toxemia, which may be briefly stated as follows:
(1) No case of TNT hepatitis (inflammation or damage to the liver) of the large numbers examined by the witness ever developed into cirrhosis of the liver. Although extremely sick, recovery was complete and apparently permanent, judging from the experience span of ten years following World War II.
(2) The toxic effects of TNT may have two major results:
(a) Damage to the bone marrow, producing aplastic anemia, which condition is almost 100% fatal, and,
(b) Chemical hepatitis, commonly evidencing a large swollen liver, jaundice, nausea, vomiting, headache, drowsiness and a general appearance of extreme sickness.
(3) Minor types of TNT toxemia commonly result in a mild secondary anemia or dermatitis.
In addition to the above conclusions Dr. Eddy developed a differentiation between cirrhosis and hepatitis of the liver by defining. the former as being the result of repeated damages to the liver, resulting in the production of scar tissue, which, in his words, has the result of causing the liver *387 to “heal itself to death”, which process is marked by a shrinking of the organ and the loss of its multiple functions.
When plaintiff consulted Dr. Eddy on July 31, 1953, he gave a history,'as testified by the doctor, that was:
“essentially one that while at work he became ill and after going home from the job he remained ill and became yellow and was later seen by a physician who told him he had jaundice and sent him in.”
The witness testified that plaintiff gave no history of termination of his employment nor of later working for a railroad but led him to believe that he had been forced to stop work because of illness and had remained sick continuously since that time. After examination the doctor found plaintiff to be acutely ill, deeply jaundiced and, as a result, in need of immediate treatment. Plaintiff was hospitalized for the purpose of needed bed rest, careful observation and treatment. Dr. Eddy, as did Drs. DeLee and Nadler on later dates, subjected plaintiff to numerous elaborate medical tests which were of such a technically scientific nature as to admit of ac- • curate evaluation only by skilled physicians, and which, accordingly, we refrain from discussing, with one exception, as later noted.
Dr. Eddy’s immediate diagnosis of plaintiff was TNT hepatitis and his hospitalization and treatment were predicated upon the conservative procedures, relating to a liver affection. It was not until after plaintiff’s discharge from the ‘hospital and the subsiding of a jaundiced-condition that Dr. Eddy made a thorough gall bladder examination, with the result, .in his own words:
“ * * * I made some studies of his gall bladder, after giving, him. the usual dye, and made a very interesting discovery. This man has gall bladder disease and has at least one very large stone, ahout as big as a nickel on the film, and he probably has many small ones. It is very unusual to find a single large stone like that without smaller stones. So this man then turns out to be a patient who has gall bladder disease and gall stones.
“Q. What -date were those films made? . A. October 10, 1953.”
In other words, Dr. Eddy was, frank in -his admission that his early diagnoses of plaintiff’s condition were mistaken. The mistake, on the basis of all the medical testimony, is easily understandable, for the symptoms of the- contradistinguished diseased conditions are, as best we can determine, almost identical, and the history given by plaintiff to Dr. Eddy was such as in itself served to practically eliminate the existence- of any doubt as to the correctness of a diagnosis of TNT hepatitis.
At the -time of the taking -of his deposition this witness had the opportunity for examination of a somewhat detailed report made by Dr.-Nadler and the laboratory reports and testimony of Dr. DeLee. Jt is quite evident that one of the points of conflict between the medical opinions of Drs. Eddy and DeLee originated in their different techniques of administration and the consequent interpretation of results with respect to what is called bromsulfalein tests, in the performance of which a dye normally removed from the blood stream by the action of the liver is injected into a vein. ' The efficacy of the test apparently depends upon measurement of the percentage of the dye remaining in the • blood stream after the’lapse of given periods of time. These periods, in the technique approved by1 Dr. Eddy, are spaced at intervals of five, ■ thirty and forty-five minutes following the injection of the dye into the blood stream, and, apparently, it is the last or forty-five minute period which determines the question of the efficient functioning of the liver in this relation. Dr. Eddy testified that normally the liver should remove-the dye, subject to the retention of not more than five percent, within.the forty-five minute period, and this witness.regarded the five minute test as being of no consequence and. th.e thirty minute test as being of little consequence.
*388 On the other hand, Dr. DeLee’s procedure and the conclusions drawn therefrom were predicated upon the five and thirty-minute interval tests. In Dr. DeLee’s three tests two showed a ten percent retention at the end ■ of thirty minutes and one indicated an eight percent retention at the end- of an identical period. The two experts therefore differed in their conclusions.
We now undertake consideration of the testimony of Dr. R. B. DeLee, an eminently qualified specialist in internal medicine, whose qualifications, however, according to the record, only reflect his graduation from Tulane University in 1934. Dr. DeLee described his results of the liver function test as above described and stated his conclusion that the test demonstrated a considerable amount of liver damage. Dr. DeLee also testified that he found- indications of the presence of esophageal var-ices i-n x-ray and fluoroscopic examinations of .plaintiff which he considered to be indicative of liver damage. This witness diagnosed plaintiff’s condition as a cirrhosis of the liver but he refused, under examination by plaintiff’s counsel, to express the definite conclusion that such condition resulted from TNT. exposure, and we quote as follows :
“Q. * * * Would you say that his development of cirrhosis is a natural — or a consequence of his working around TNT for- a .period of eighteen months being in daily contact with it? A. I couldn’t say that. If he had hepatitis, or if he had exposure to the TNT which had produced a hepatitis, it could have produced what he now has. I don’t know that it did.
“Q. In other words, what he has now is a consequence of TNT hepatitis ? A. It could be.
“Q. Doctor, what is yoúr opinion as to whether or not George Austin could do a day’s work from the exami- • nations and tests that you made? A. He could do light work.
“Q. What is your opinion as to his chances of improvement? A. I see little likelihood of improvement.
■ “Q. Doctor, will TNT cause hepatitis of the liver? A. Yes, sir.
“Q. Or what you call TNT hepatitis? A. Yes.
“Q. Will TNT hepatitis pass to fatty degeneration of the liver ? A. Yes.
“Q. Will fatty degeneration of the liver pass to acute yellow atrophy of the liver? A. Yes.
“Q. What is the difference between cirrhosis and acute yellow atrophy of the liver? A. A question of degree of liver damage, and a question of time. The acute yellow atrophy progresses in such a rapid manner there is no time for scar tissue replacement and contraction.”
In answer to an hypothetical question, several times restated, the witness testified :
“Perhaps I can best explain that if this man should come to me with those symptoms I would assume that it had been caused by TNT, but, as far as proving it at this late date, I would have no method that I could prove it by.”
Summarizing the effect of Dr. DeLee’s testimony, we are impressed with the fact that his diagnosis was based on two examinations, laboratory and x-ray reports, made in relation to the history of TNT exposure and the symptoms described by plaintiff in relating his history. Dr. DeLee made no gall bladder examination but disagreed with the findings of Drs. Nadler and Eddy in this respect.
Dr. Samuel B. Nadler of New Orleans examined plaintiff on March 9, • 1954, and the result of his examination is set forth in considerable and impressive detail in his testimony taken by' deposition. " Because of their importance in connection with the determination of the existing *389 facts in the instant case, we set forth below Dr. Nadler’s qualifications and experience as given by him in answer to direct interrogatories:
“I am a physician licensed to practice under the laws of the State of Louisiana. I obtained an A.B. degree at McGill University in 1926; M.A. degree at Harvard College, in 1929; Ph.D at Harvard Medical School in 1931; M.D. degree Tulane Medical School, 1936.
“I am a member of the • A.M.A. Society for Experimental Biology and Medicine; American Diabetic Association; Fellow of the American College of Physicians; Diplómate of the American Board of Internal Medicine.
“I have restricted my practice to Internal Medicine since serving as Chief of Medical. Service at Touro Infirmary in New Orleans for four years, 1947 to 1951.
“I am full professor of Clinical Medicine at Tulane University Medical School. I have been teaching at Tulane Medical School since December of 1930. I have had considerable experience in diagnosing and treating patients with liver disease and have published articles on the detection of evidence of liver damage. The nature of my practice is such that the problem of liver disease is almost a daily problem.
“3. Please state what experience you have had in treating patients who have been exposed to T.N.T.
“(Answer) I have had very little experience in treating patients who have been exposed recently to T.N.T. The only cases that I have seen with recent exposure were cases sent during the last war which appeared at my office, both from the plant at Minden, Louisiana, and the plant at Aberdeen Mississippi.
“Some years ago, I examined ten patients at Aberdeen as an appointed physician by the United States Government to act as Court Referee from the medical standpoint. In addition to these ten patients, I have examined perhaps two dozen ‘suspected cases of T.N.T. intoxication.’
“4. Please state whether you have made a special study of the effect of T.N.T. exposure on individuals and if so, what the same consisted of.
“(Answer) The nature of this- question is rather obscure to' me. The special study which I have made on the effects of T.N.T. exposure, has largely consisted of such study as could be directed to the observations recorded in the medical literature. I have not done any research on T.N.T. exposure, except for reading.
“5. Have you had experience .in examining and treating people who were suffering from cirrhosis of the •liver? If you have answered the above in the affirmative, please state in general your experiences.
“(Answer) Yes. I would estimate that in the past fifteen years, I have examined and treated approximately one hundred cases of cirrhosis of the , liver. In addition to the examination of these cases, which required reading of the literature, and the teaching of medical students, I have been instrumental in bringing to the fore the accuracy of diagnosing liver disease in which the differentiation of cirrhosis of the liver from other disorders of the liver might be obtained. These observations are a matter of record in published articles.
“6. During your entire practice have you ever examined or treated anyone who had cirrhosis of the liver that was due to exposure to T.N.T.? If so, please state the approximate number of such cases you' have found?
“(Answer) No.
“7. ■ Have you within the' past year made a research of the medical books *390 and authorities in order to ascertain whether there are any cases of .cirrhosis of the liver on record that was caused by T.N.T. exposure?
“(Answer) Yes.
“8. If you have answered the above in the affirmative, please state the extent of your research and whether or riot, and the results of same with particular reference to the number of individuals who have or have not developed cirrhosis of the liver caused from T.N.T. exposure.
“(Answer) I have carefully examined the medical literature which has been, published during the past fifteen years with reference to the possible development of cirrhosis of the liver by T.N.T. exposure. I am unable to find a single case recorded in the literature. It should be clear that a number of cases of toxic hepatitis are recorded, but not a single case of cirrhosis of the liver.”
In the development of his testimony Dr. Nadler discussed in detail the distinction between hepatitis and cirrhosis of the liver with reference to the symptoms, which the doctor stated may exhibit parallels in the two affections. Proceeding to a consideration of plaintiff’s case as evaluated upon his examination, the witness stated:
“The time interval between May 8, 1953, and July 20, 1953, is approximately ten weeks. I think it is extremely unlikely that exposure to '.T.N.T.' could have produced jaundice or hepatitis in Mr. Austin after ten weeks removal from exposure to T.N. ■T. The impression which I have with reference to this opinion is gained from a perusal of all the medical literature. I do not believe that I recall a single instance in which jaundice or hepatitis occurred as long as ten weeks after removal from exposure to T.N.T. One can only proceed on the basis of the recorded clinical observations and these observations substantiate the view that jaundice, or hepatitis does not occur after this _ long interval of removal from exposure.”
Specifically with reference to plaintiff’s condition at the time of his examination the witness declared:
“When I saw George Austin, he had no evidence whatsoéver of hepatitis or of cirrhosis of the liver. I found, at the time of my examination, no evidence that this individual had any disability whatsoever which would prevent him from performing' manual labor. Not having found any -disability, I cannot attribute any of his findings to- exposure to T.N.T. while employed by Remington Rand. My conclusion with reference to this individual was that he had no evidence at the time that I saw him of any organic disease whatsoever.”'
The doctor’s conclusion as to plaintiff’s condition is embodied in the following extract from his testimony:
“The conclusion arrived at on the basis of the x-ray examination of Mr. George Austin’s gall bladder was that the patient had gall stone, possibly gall stones. The medical name for this is- cholelithiasis. In spite of the presence of stone or stones, there was fairly good contraction after the fat meal, indicating fairly good function of the gall bladder.
“27. In your opinion, was this condition of recent origin or same existed over a period of time?
“(Answer) I do not believe it is possible to tell exactly when stone or stones first appeared in the gall bladder, but a stone of the size of this one would almost certainly take several months- to reach its size, 1.7 by 1.7 centimeters. It is possible that this stone or stones have been present in the gall bladder over a period of several years.
*391 “28. Was this condition' in any manner caused or aggravated by Mr. Austin’s exposure to T.N.T.?
“(Answer) No.”
The witness developed in convincing detail the reasons upon which he based his diagnosis. While the details of this testimony would add much to this opinion from a medical standpoint, we think it would unnecessarily burden what is, after all, intended to be the expression of a legal opinion and it suffices to say that the explanation is supported by, such an evident understanding and application of scientific and practical medical knowledge as to place the conclusion reached beyond the reasonable possibility of successful contradiction. We do think there is one pertinent reference in Dr. Nadler’s testimony which is important for the purpose of further explaining Dr. Eddy’s original error of diagnosis, and as reflecting the very definite opinion expressed by the witness in question:
“In possession of all of the data that Dr. Eddy had at the time he .saw Mr. Austin with his jaundice, I would unquestionably have adopted the conservative course that he adopted, awaiting further developments.
“If Mr. Austin had failed to improve clinically, I think there would have been ample justification for surgical intervention. The clinical pictures that he presented is the clinical picture not infrequently seen with obstruction of the bile duct and an associated' moderate hepatitis. This constitutes one of the' most difficult problems in clinical diagnosis seen today.
“With reference to the possibility of obstruction within the liver producing jaundice and caused by cirrhosis, it should be noted that any patient who reaches the state of cirrhosis — and I say that these cases are all' associated with active hepatitis during the acute jaundiced stage — bears the stigmata of having marked liver damage for the rest of their lives. When I examined Mr. Austin in New Orleans, he had not one iota of. evidence to suggest the possibility of residual liver damage. I feel very keenly about the fact that he does not have and has never had cirrhosis-of the liver.”
In conclusion we are firmly convinced, on the basis- of the expert, testimony, that the evidence in the instant case definitely preponderates against plaintiff’s contentions. We think the conclusion is inescapable that plaintiff’s disability . results from a gall bladder condition, entirely and completely unrelated to any occupational disease and specific toxic effects from the handling of and contact. with TNT in the course and scope of his employment by defendant’s insured. With due deference to the opinion, of our brother of the district court, we think the judgment appealed from is manifestly erroneous. This- conclusion rests primarily upon what we regard as the overwhelming preponderance of the. evidence in favor of defendant, and, secondarily, upon the proposition that the only support of his claims by any medical witness is at best predicated upon an hypothetical possibility. Despite the liberality of construction and interpretation which is accorded under both the letter and spirit of our compensation statute, the principle has been many times established and enunciated in the. jurisprudence of every appellate court of this state that -possibility, surmise, speculation, even probability, in themselves are not sufficient to support recovery in the absence of a reasonable preponderance of the evidence.
For the reasons assigned the judgment appealed from is reversed and set aside and there is now judgment in favor of defendant rejecting plaintiff’s demands at his costs.